Good morning, Your Honors. May it please the Court, I'm Richard Kawana, attorney for the appellant in this case, Thomas Schnepper. Appellant Schnepper was sentenced on January 27, 2004, for one count of knowingly attempting to persuade, induce, and entice an individual who has not attained the age of 18 years to engage in unlawful sexual activity and five counts of knowingly attempting to transfer obscene material to an individual who had not attained 16 years of age, knowing that the person had not attained the age of 16 years. The appellant was sentenced to 87 months and three years of supervised release and a $600 special assessment. We have raised on this appeal several grounds of his sentence and the actual conviction itself. Now at the outset, Your Honors, appellant's conviction must be reversed because he has been trapped as a matter of law. The evidence was insufficient to sustain conviction. He was denied a fair trial by the court's evidentiary rulings in allowing a highly inflammatory and prejudicial graphic, computer graphic, to be submitted to the jury and because we have submitted a prosecutorial misconduct. Now he also appeals should the court, he also appeals from the sentence in this case, should the court not reverse the judgment of conviction, it should nevertheless vacate the sentence imposed with directions to reduce the number of criminal history points and the offense level with respect to the sentencing guidelines and to lower the sentence as required under the guidelines. Now I'd like to... Why wouldn't if in that case we just give it an amyline remand and let the district court re-figure out all of this? Well, because the district court, Your Honor, made certain rulings during the course of the trial which affected the guidelines directly. So given the fact that this case is up here and the court can direct the court with respect to how it should handle certain guideline issues, it would be appropriate for the court to address those issues and to rule on them, thereby giving the court down below additional guidelines as to what it should do. I'm sorry, I don't understand the argument. How do trial rulings affect... I mean I understand you've got arguments on the conviction, but how do trial rulings affect the sentence in a way that an amyline remand would not cure? I just don't understand your answer to Judge McKeon's question. Well, Your Honor, with respect to the trial ruling in terms of the admissibility of evidence, that would be the first ruling that we would submit should be taken into consideration. With respect to the graphic that was transmitted, the Exhibit 8 of Count 8, even though Count 8 was dismissed... You called it a graphic, but it was a photograph, right? It was a photograph that was transmitted, that's correct, Your Honor. Okay. So where does that figure into something that we would need to give a direction on? Well, Your Honor, I think the court has to... Well, first of all, Your Honor, with respect to the graphic itself, we would submit that the court would need to basically reverse the conviction because of the fact that the graphic was used. Well, okay, we're mixing and matching sentencing and conviction now. Let me start with sentencing. Okay. We asked why an amyline remand wasn't sufficient. You raised issues with the trial that would cross over to sentencing. Okay, well... I could see that might happen, for example, on the obstruction of justice, but you then started down this line of the photograph of the, I guess, young woman, I'll call her, 20-year-old. Well, Your Honor, apparently... How does that relate to the sentencing? Well, Your Honor, I obviously misunderstood the question. I guess the sentencing guideline enhancements that we would ask the court to address would be the use of the cross-reference to Guideline 2A.3.2, in which the court used the cross-reference from 2G.1.1 in order to increase the guideline base offense level from, I believe it was 17 to 21. And basically, it denied, essentially, it denied the defendant the right to a grand jury indictment of the charge because that guideline cross-reference essentially was the guideline for statutory rape. And even though, in this particular case, there was no actual contact between the defendant and the person who was an undercover individual. So we would submit that that would be one of the issues that the court has to decide. He was denied a right because the indictment was essentially constructively amended. And so we would submit that that is one of the key issues here. Now, we submit that the fact that the defendant never, ever, in fact, had any contact with the minor who was, in fact, an undercover individual, a middle-aged undercover individual, when he testified at trial. The fact that he did not really induce the undercover individual to come to the island of Maui. And the fact that, nevertheless, he was charged with knowing misrepresentation of the participant's identity to persuade, induce, entice, or coerce the victim to engage in prohibited sexual conduct, or to facilitate transportation or travel by the victim or participant to engage in prohibited sexual conduct, which is the language of the cross-reference, demonstrates how far afield this guideline enhancement went. So we would submit, at best, excuse me, Your Honor. I'm sorry to interrupt you. Due to the assistance of travel, I need about two minutes health break. Judge Kuczynski, if you don't mind. We'll take a two-minute adjournment. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Sorry to hold you up, Judge McKeown. Counsel, I'm sorry to interrupt the flow of your argument. No, you're all right. We are back in session. Judge McKeown is still on the phone? The gist of your argument is that if you cross-reference and the question is this attempt to commit statutory rape, that this couldn't be characterized as such an attempt, so that would be an improper application of the guidelines. And that's an issue you want us to decide as a matter of law? That's correct, Your Honor. That is certainly one of the aspects of the issue. Well, let me go back to the picture, which you then were mentioning as well, the photograph. Even if it were, for talking purposes, an error to admit that, what was the prejudice in light of the other exhibits, two through seven, I think they were, including the peanut butter picture and other things? Your Honor, the enticement issue was essentially the main issue that the prosecution was pushing. Essentially, they were saying that Mr. Schnepper was trying to entice a minor, and therefore it was essential to their case to show some type of graphic where he indicated some type of interest in underage girls. Well, you didn't need the graphic if you had plenty of stuff in the IM and the chat room transcript. That's correct, Your Honor. And that was explained by Mr. Schnepper in terms of the fact that he was cyber role-playing. Now, the jury could have believed her, and in this case it didn't, but I think one of the reasons it didn't was because it was shown what we would submit as a highly inflammatory graphic, which basically supported the thrust of the prosecution's case, that here was a man that was interested in enticing an underage female for the purpose of having sex, and look, we're sending a graphic showing what appears to be, or what the jury we would submit was led to believe. I guess I'm not entirely sure why that's so inflammatory or prejudicial. If you're playing a role, which is what your client claimed he was doing, then he would also send that kind of picture. The picture seems consistent with either the defense theory or the prosecution theory. If they believed him that he was role-playing, then they would believe that the picture was sent in furtherance of the role-playing. So I don't know how it cuts one way or the other in particular. I must say it would have been quite different if he had sent a picture of himself maybe with a young girl, but then we'd have a different case. But I don't know. Even accepting your argument that this was prejudicial, or that this was erroneous, why was it prejudicial? I think the issue is this, Your Honor. It was erroneous because everything during the course of the trial had a certain bit of ambiguity about it with respect to this particular photograph. It wasn't until the defense had presented evidence that in fact the people in the picture were adults that we first had our chance to present to the jury that here in fact the photograph that was presented to the jury as part of the prosecution's case was never disclosed to be of adults, and therefore it's one of those situations at the trial level, which I'm sure Judge Hogan fully understands more than as a trial judge, that sometimes the jury is convinced within the first day of testimony. The bell can't be unrung. And then when you try to do it, it's very, very difficult to do it. So I think the fact that that's... That's why district judges, in my experience, normally instruct juries at the end of every day of testimony. Now, you haven't heard all the evidence, so please don't make up your mind. At least I've heard that. I've done it. Some of them do that, and I think maybe I have on occasion, but what is more interesting about your argument to me, at least in the cases like this that I've tried, there's never just one picture, and there weren't in this one. And I think it's hard to separate out and say, well, this picture tips it over, and how do you deal with that? Well, Your Honor, I think Judge McKeown had addressed that partially in the sense that she said that the photographs that were submitted into evidence were basically of Mr. Schnepper himself, obviously inflammatory, somewhat inflammatory for the jury. I'm certain it was. And then a picture of another woman, who was obviously an older woman, but the key to the prosecution's case in terms of turning the tide and saying that Mr. Schnepper should be punished for dealing with young girls is the graphic in 8, because the graphic itself, I think all of the participants in the trial, judge, and obviously the prosecution, felt that it clearly appeared to be a very young girl having sex with a very old man. And the impact was stunning, to put it mildly. And so the fact that it was allowed to get into evidence, even though we would submit it was not relevant, and even if it was relevant, it was only marginally so, and certainly outweighed by the prejudice that it caused, was such that, again, the bell could not be unrung. And I think that the reluctance of the prosecution to allow the court to make a ruling at an earlier stage of the proceeding indicates how important this particular graphic was in the prosecution of the case. So we would submit that that certainly is something that should be taken into consideration by this court, especially where on the eve of trial, and the trial court obviously didn't like the idea of having the issue brought up because it was at the last moment. However, our expert, Mr. Lawson, had discovered that after going through the websites and whatever information that he had, that in fact this was a photograph that had the government got through the National Center for the Exploitation of Missing and Exploited Children, could have found out that it was, in fact, between consenting adults. So that makes it even harder to understand why they would nevertheless pursue this matter. One other question I have, though, is that it seemed to me that the jury, we might infer quite reasonably, that it was not indiscriminate in that he was acquitted on one of the counts in terms of transferring obscene material. Count 6, was he not? Yes, he was, Your Honor, and I believe that was one of the photographs or the graphics of himself as opposed to a graphic of... Right, but the jury was looking, you know, it wasn't... All in all, they had a series of photographs in front of them, and it seems to me that they were able to distinguish, and they also, I don't quite understand how it helped that it wasn't him in that photograph, when, in fact, it's somebody having sex. Well, Your Honor, I don't believe that was the photograph of someone having sex. No, I'm talking about number 8. Oh, number 8. Number 8, but it is somebody having sex, correct? That is correct, Your Honor. And whether he thought he was asking a 15-year-old or a 50-year-old or a guy, whoever he was asking was to have sex, correct? That's clear from the transcript. Well, Your Honor, that's true, but that was in the context, as Mr. Schnepper testified, of role-playing, cyber role-playing, and so... It took it a little beyond role-playing when he sent the ticket and went to the airport to pick this person up, right? I mean, it went beyond role-playing. I mean, that's saying role-playing a bit farther than... Well, Your Honor, I think that ties into the issue that we have raised about entrapment as a matter of law. As Your Honor knows, the United States v. Pullman case is the leading Ninth Circuit case. Entrapment was submitted to the jury, right? Excuse me? Entrapment was submitted to the jury. Yes, Your Honor, it was. And there was an entrapment instruction, which you don't challenge. Your Honor, the only thing that I would say about the entrapment instruction is that it didn't quite follow the language upon reflection after reading the Pullman case of the Pullman case. In other words, it said that the... But this wasn't an objection raised below. No, it wasn't, Your Honor. And it wasn't in your brief either. No, it wasn't, Your Honor. I think all you raised in your brief is basically that there was entrapment. I have a question of whether it was waived even. Had I read the Pullman case before I wrote the brief, Your Honor, I would have certainly included it. It's a very good case. Yes, Your Honor, it is an excellent case. I think it is the leading Ninth Circuit case at this point. I think it's the leading case anywhere on anything. Right, absolutely. I'm just biased. Right, and I believe it sets the right balance between the rights of the state as opposed to the... I couldn't have said it better myself. Let me ask you this. Your client was convicted of sending obscene photographs on at least one count, maybe several counts. Did you challenge, are you challenging the obscenity of the photographs? Your Honor, the jury was given the... Miller test instruction, right? That's correct, Your Honor. And are you challenging that finding here, the determination of obscenity? Your Honor, we did not do it in the brief. However, if Your Honor believes that it raises the question that I missed, I certainly would defer to the Court's expertise on this matter. Perhaps it might be plain error if Your Honor sees something. But we did not challenge it below. And, again, if there was something there... Well, you submitted to the jury below, that's probably enough, but I didn't see your brief had a very conclusive statement about insufficiency of evidence on the very last page of the brief, and I just wanted to see what you were raising, whether you were raising an objection or... I think it's... If raised, it is raised very obliquely, but it sounds to me like what you're saying is until I mention the thought, it will never cross your mind, so you're really not raising it. Well, Your Honor, we submit that given the nature of the evidence that was produced by the government, essentially chat information, that that in itself, especially given the guideline crossover, was insufficient to convict the defendant. For example, we would submit at best... I'm sorry, convict the defendant of what? Of each of the counts that he was convicted of, that is, of the enticement count as well as the transmission. The difficulty is that you made a statement in your brief, you just say there's insufficient evidence and you don't identify specific evidence, so it seems to me that it's too late in the day on an oral argument  I understand, Your Honor. Okay, all right. Judge McEwen? No, I had nothing further, thank you. You are in overtime right now, Judge Schultz. Nothing. We'll give you a minute for a bottle if you wish to take it. Thank you, Your Honor. Okay, we'll now hear from the government. Good morning. May it please the Court, I'm Larry Tong, Assistant United States Attorney, appearing for the government. I would agree with Judge McEwen's comments. I tried to address as best I could the issues that were raised in my colleague's brief. I, too, was troubled by what he was claiming relative to the insufficiency of the evidence, and I would say the alleged insufficiency of the evidence. I have tried to cite to the Court the evidence which I suggest was more than adequate for a jury reasonably to conclude that the defendant was guilty of the various counts of which he was convicted. I think any arguments that he should raise for the first time today should be deemed abandoned because there's no showing of manifest injustice as is required by this circuit's case law. If I can address briefly some of the points that came up relative to the entrapment issue, again, I was troubled by that argument simply because I didn't know what he was arguing. The jury was fully instructed on the law of entrapment. There were no objections whatsoever to the district court instructions. He didn't raise any objections in this court, so any issue has to be reviewed for plain error at best. The only issue that I thought he was raising was that there was entrapment as a matter of law, which seems to be a different term of art under the Jones case out of the circuit in 2000. And under Jones, in order to prevail on his entrapment as a matter of law claim, he has to show that there was undisputed evidence of entrapment. And I've cited for the Court a few instances. There are many in the chat logs that Your Honors can review, but the short answer is 15 minutes into the first chat with the undercover officer, whom he thought to be a 15-year-old girl, the defendant sent pictures of his own anatomy. And when he sent those… Well, it is certainly disputed whether he thought her to be or the other correspondent to be a 15-year-old girl. That's clearly disputed. That is clearly… The timing is not disputed. What was sent is not disputed. What was in his mind is disputed. Not only was it disputed, Your Honor, that was the single most important issue in the entire trial. And ultimately it boiled down to did the jury believe that he was role-playing, having this sort of cyber fantasy with someone he thought was an adult pretending to be a child, or did they believe that he, in fact, wanted to pick up a 15-year-old girl for sex. And the argument that – or this is more of a discussion, but the argument that we had in the district court level, of course, focused very heavily on that particular issue, which was the single most important issue before the jury. And ultimately that was the single factual determination made by the jury, and that's one that I submit this Court needs to respect. Well, I realize that we've upheld in Meek last year, we upheld the conviction on very similar grounds, on an attempted conviction on very similar facts as this one. I'm a little troubled by the fact that our older cases, like United States v. Still, United States v. Buffington, seem to require far greater, you know, obviously on different facts, but they do seem to require getting much closer to the crime than the defendant did here and the defendant did in Meeks. I wonder if you think there is a tension or case law on attempt. Your Honor, the leading case, I believe, is the Meek case, which was authored by Judge McEwen. It's certainly the most recent case, and I don't want to detract from its status by saying it's not the leading case. It may well be the leading case. It kind of is up there, I would say, with Pullman. I think easily in the same constellation. Absolutely. And I am not, I mean, But I don't want to, I'm not claiming star status for it. I'm sorry? I'll just take it as precedent. And I'm not disputing that either. I'm just wondering, my question is, is it consistent, is Meek consistent with our earlier cases, like Buffington and, let's see, where we said there must be some appreciable fragment of the crime committed, there must be such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter. And in Buffington, there were bank robbers that were sitting in front of the bank, or they were parking in front of the bank, and they abandoned their attempt to commit a robbery because there was a power outage. So they drive up to the bank, they stop in front, they park, and they're about to go in and rob the bank, but there's a power outage and they get deterred from going forward with it. So, you know, there's an actual bank, they are sitting outside, I mean, this is not a fake bank, this is not a pretend bank, and the only reason they drive away is that they are thwarted because of this power issue, and as they drive away, they get stopped by the police, and they admit, yes, we were planning to rob the bank, and we reversed the conviction. This is the United States of Buffington, 815 Fed Second, 1292. And I'm just wondering, is that, and Meek does not cite Buffington, I don't think, and I'm just sort of wondering whether these older cases can be reconciled with Meek and what we ought to do, if anything, about this. Well, Your Honor, I do think it's a factual inquiry, and Meek establishes you do not need a real minor, which I guess would be analogous to a real bank. Well, I understand, and that is certainly an important aspect of Meek, and I think that is its core holding, and I don't think anybody is disputing that. You don't need an actual minor. So, I mean, just to put that aside, let's say, for example, there had been a very young-looking agent that gets off the plane, and I'm not saying the government should do this, I'm just pointing to a different scenario, and let's say Mr. Schnepper had gone to the airport, had seen the undercover agent who looked like he might be a minor, gets off the plane, and he greets her and gives her a big hug and kiss, and is about to take her on the motorcycle to drive away, and they then would say, okay, well, you know, that doesn't undermine, I mean, you know, Meek would still hold in that you don't have to have an actual minor, but he would have gotten much further down the road. So here we're dealing not with a question of do you need a minor.  I'm questioning how far down the road you have to get in order to have an attempt, and Buffington seems to point, and our earlier cases seem to point in a different direction. Well, Your Honor, if I may, the reason I raise the minor point is I think that goes hand in glove with the issue that Your Honor is struggling with, because if you assume for the sake of argument that it can be a crime to attempt to entice a minor when you are dealing with an undercover officer, then the issue becomes, well, what more are you going to require by way of proof to show the defendant's intent? And in your analogy, you could have a young, appearing under- No, no, no. You could have intent to engage in sex with a minor even though there's no minor present. Well, alternatively, though, let's say there was a minor. Let's say that the person showing up from Wyoming was a kid, but the FBI had gotten wind of it. Under Judge Kaczynski's scenario, I guess you'd have to put the kid on the motorcycle and drive into the woods with the handcuffs potentially to have an attempt. So whether you have a minor or not doesn't matter, but it seems to me that in this kind of an offense, the question would be, you know, where does the attempt begin and end, and how far do you have to go when you're enticing a minor? Do you have a way that we could measure that? I think I don't have a hard and fast rule, Judge McKeown. The analogy you just gave is very similar to the fact pattern of the Dhingra case in which Your Honor also authored an opinion not cited in my brief, 371 Fed 3rd 557. There, there was a real minor, and then the FBI became aware of the incident, and they substituted in an undercover officer, and you still had a conviction for attempt under the same statute affirmed. The concern I have is very similar to what I read into Judge McKeown's question, which is if we say you need something more than what we have here, it's just simply bad public policy because then you're going to essentially encourage law enforcement. Well, I understand that it may have been bad public policy to let the robbers get away in Buffington after they drive up to the bank ready to rob it, and they drive off. They get stopped by the police, and they admit, yes, we were going to rob the bank. I think that's horrible public policy myself, but we don't do public policy. We do law here, and to me the cases seem to, and Buffington is not alone. We have a series of older cases that do seem to require, and we have reversed convictions that to my mind seem to go much farther down the road towards completion than the conviction in this case or possibly the conviction in Meeks. Now, the reason this winds up being significant, we obviously can't overrule Meeks or necessarily be inclined to do so either, and I'm not saying which line of cases is the correct one. I'm just focusing on the question of whether there's a tension here, but what we can do is decide whether this case is on the Buffington side of Meeks or on the other side, and it seems to me, and maybe you can speak to this question, that in this case the crime had progressed less far than the crime in Meeks, that he was apprehended in Meeks, and this may not be a particularly powerful distinction, but perhaps you can address it. In Meeks, if I understand correctly, he actually went to the school and was looking for a kid when he got arrested. Here, he gets arrested on the way to the airport. He's on his motorcycle. He might have gotten to the airport and gotten cold feet. There are lots of places along the way where his conscience might have gotten the better of him, and that's how the law works. I mean, you do have people who think about committing crimes. Probably everybody at some point or another considers and says, gee, I wish I could be really angry at somebody. I wish I could punch him out, right? And you have that thought in your mind. Maybe you haven't, but I'm sure a lot of people have. And you don't do it. You don't come close to swinging a fist, but the law doesn't punish bad thinking, and one of the reasons is because we have some faith in people and the idea that they can change their mind and before they come to the point where they actually commit a crime, their conscience gets the better of them. They say, no, look, I'm not going to do it. And to me, it seems the farther away from the point of contact you stop the individual, and you may think it's a trivial point, the less convinced I am that, in fact, he might have gone forward with a crime. And so this seems to be on the buffing side of Meeks rather than on the other side. Tell me whether you disagree with that. I do disagree. I don't disagree with your comment that this is nontrivial, but I don't believe that this was a case of questionable intent. If Your Honor will review the transcripts, prior to going to the airport, the defendant essentially progressed to this talk where he said, and remember, Your Honor, the jury found that he believed he was dealing with a 15-year-old. He said, I want to act out a rape fantasy. I will bring a towel. We can do it in the woods if you want to do that before you come to my place because that way it will seem more real since we will not have known each other. He says, I will bring handcuffs. He then drove to the airport and went right up to the waiting area, parked his motorcycle, he had handcuffs with him, a towel, and two condoms in his pocket. Now, I don't know what else we could require other than having, A, a real minor, which Meeks says we don't need, or, B, having someone impersonate a real minor and have him physically go up to the minor and engage him. Where exactly he had parked his bike at the airport? He pulled up to the baggage area. That's in the record, Your Honor. That's where he was arrested. He drove his motorcycle all the way from Lahaina to the Kahului Airport, which is a 45-minute drive. He was undersurveyed. I've driven it many times. I'm quite sure you have, Your Honor. Very pleasant drives, too. And you're familiar, I'm certain, with the Maui Airport. And he drove into the Maui Airport, and he was in the baggage claim area on the outside, seated on his motorcycle. He was waiting outside the baggage area. Yes. And again, Your Honor, this is in 19—I'm sorry. So what you're saying is this is highly analogous to Meeks. This is just like— Highly analogous. The only difference I see is in Meeks he went to a school, so arguably you could say, well, he had more reason to believe it was a minor, but ultimately, again, that's a factual issue that I think was properly decided by our 12 folks in the community down below. But it's highly analogous to Meeks. He went right to the airport. He was waiting. If I may make one other point, this was after 9-11. I suppose had it been pre-9-11, we could have, we being law enforcement, could have said, why don't you go to the gate or wait until he goes to the gate to meet the minor. But with the increased security, there was testimony there that he went up to the baggage claim, sat on his bike, appeared exactly as he had promised to appear, with the towel that he said he was going to use in the woods, with the handcuffs he said he was going to use on the young girl, with two condoms in his pocket. Now, granted, he had an adequate opportunity to say, this doesn't mean what it seems to mean. He testified that I had the towel to shine up my Harley. I had the handcuffs as a decorative item. I had the condoms as a leftover of a prior visit with my wife. Whether that's ridiculous or not, as I had argued, was ultimately for the jury to decide. But from the standpoint of the standard of review to be used here in applying the established law of Meek and others, I think surely it's adequate to sustain the substantial step necessary for an attempt conviction. And I raise the public policy only as an adjunct, Your Honor. I certainly agree that the court's in the business of defining the law. But I just think that if you drew the line elsewhere, it would make bad policy and it would encourage law enforcement in these types of operations to take too many risks. And it would hinder their ability to prosecute and detect these types of offenders. Okay. I take it that your answer to the – I don't want to put words in your mouth, but I take it that your answer to the objections raised to the sentencing are enameling remand. Well, I'm going to – Go ahead. I'm going to take a stab at something a little more. I mean, the court obviously can disagree with me. I realize Amaline says you should have a remand in cases of unpreserved booker error. That was not briefed in our brief because of the timing. Right. That's why I asked you the question. And Amaline, though, does say that this court is first to review the record to see whether it can make a meaningful plain error review to see whether or not there is a probability that the sentence would have been different. I acknowledge that few cases are going to satisfy that demanding test, but I'd like to take a stab and say that this is one of them. I wish I had had you arguing a few of my cases. I would have been up here. Were you in Hawaii, I'd be pleased to have that privilege. But my argument would be that this is one of those few cases because this is a case where the defense, my good friend Mr. Kiwana, filed a motion for downward departure I think raising 10 or 11 different grounds. They're cited in my brief, page 54, footnote 46. Again, it's not this was pre-Amaline so we didn't make the argument specifically, but the grounds included a laundry list of every mitigating circumstance that one could envision. Well, Judge Kozinski, I'm sure you could envision others, but it seems to cover virtually all that we deal with. Vulnerability to victimization, abuse in prison, hardship as a child and adult, post-defense rehabilitation, medical conditions, need to be eligible for counseling and rehab, aberrant behavior, imperfect entrapment, criminal history category overstates propensity to commit future crimes, although there are 21 convictions not counted, the effect of incarceration on his business. You know, this is a good tie, but isn't it thwarted by our ruling that says, look, judges will react differently if they are under a mandatory regime than if they are under a discretionary regime. And a judge may very well reject a downward departure on this ground or that ground or that ground and might even sentence in the middle of the sentencing range if the judge feels he's handcuffed, so to speak, to the guidelines, but in an environment where the judge feels, you know, departure is okay, one way or the other it's a matter of discretion, the sentence might well be different. And so I'm not sure this is going to get you very far. Well, if I can try just for my last 17 seconds, Your Honor. Let me just ask one question. Could the judge go higher? The judge could go higher, yes, Your Honor. So that's a risk, but they're willing to take it? And that's a substantial risk because in this particular case he said he had discretion to go lower. He chose not to do it. Judge Kaye then said that there were no mitigating circumstances that he could see. He cited every aggravating circumstance in the record, and he says you need the highest sentence possible under the guidelines. I quoted that on page 55 of my brief because the defendant posed a significant danger to society and high likelihood of recidivism. And he says the court finds that a sentence at the highest, not higher, but highest end of the applicable guideline range is justified to address the sentencing goals of punishment and protection of society. Now, none of us knew that Booker was on the horizon back when the sentencing took place. It's very difficult, I immediately concede, to find a case where a judge would envision that was going to be the change in the law and say if I had discretion I'd go much higher. Usually, as we all know, what normally happens is the judges tend to grumble about the mandatory nature of the guidelines. But there's nothing along those lines in this case. If anything, Judge Kaye said you need the highest because I can see nothing good in you, I see nothing but bad, and he went to the very high end of the guidelines. I did not file a motion for upward departure, so it did not give him occasion to address whether that was appropriate. I suppose if the court rejects my argument and there is an amyline remand, then he would have that opportunity to exercise his newfound discretion. I don't remember from the briefs. Was his actual record, is that in the briefs, his prior convictions? Yes, Your Honor. He had, well, no, Your Honor, yes and no, Your Honor. The number of convictions are referenced in the brief. I don't know that the type are specifically referenced. I believe I did it generically. A number of them were traffic and alcohol-type offenses. The accountable convictions were for stalking, for DUI, and one other conviction that eludes me at the moment. I apologize. But there were 21 convictions that were not counted. And if there were a remand, of course, that could form the basis for a higher sentence. I'd probably like this to be a really good argument, but I'm not sure I can get there. Well, Your Honor, I have to make the try because, frankly, under amyline, I think most cases will come back. But of the relatively few I've seen, this seems to be one where I think the record is pretty strong that he would not have gone any lower. But, of course, I have to concede it's always easier to say the one person who knows best is not here in the courtroom. And I suppose that's what amyline is bottomed on. Okay. Thank you very much. You've lost your time, Mr. Caruana. We'll give you a minute. Thank you, Your Honor. During which time, I want you to answer the question of whether you want your client to get an amyline remand. As you know, this is discretionary with the defendant. If the defendant chooses not to ask for an amyline remand, we will not order it. And, therefore, I realize you've got other arguments on the sentencing guidelines and other arguments on sentencing. But assuming that we do not rule in your favor on those arguments, and I'm not saying we will or we won't. Obviously, I don't know until conference. But I'm just asking, assuming that when we decide those issues, we were to rule against you on your arguments you've raised in your brief on the sentencing, would you at that point want an amyline remand for the district court to go back and exercise his discretion under the non-guidelines regime, or do you choose to waive that? Your Honor, you've asked me a question only my client can answer. Based on what I know of what he's told me from before, I would submit that he would probably ask for amyline. I'm sorry. Are you saying you would like to consult with your client? That's perfectly okay. Are you saying you would like to consult with your client? That would probably be advisable. That's perfectly fine. You have a week. Okay. Would that give you enough time to contact your client? Your Honor, I believe it would be, but in the interest of— It would give you 14 days. Fourteen days would be great. I know it's difficult sometimes. Where is your client? He's at Lompoc. At Lompoc, I see. So, I mean, it shouldn't be difficult, but sometimes communications are not— I understand. It would give you 14 days to file a statement, and you understand it should have no argument. Okay. It should simply say a defendant chooses to assert a right to an amyline remand, or defendant chooses to waive an amyline remand. There's no point in giving the government a chance to respond. This is a one-sided option, and whatever the defendant chooses, we will obviously be bound by that, and so will the government. I understand, Your Honor. We'll give you back your four minutes. Okay. Thank you, Your Honor. Your Honor, just one point on the Buffington Meekt issue. I think the prosecution has overstated the situation. For example, the issue was did Mr. Schnepper go far enough. We would submit he did not. Since Your Honor has been to the Maui Airport, he knows that the gates are a great distance away from the actual baggage claim, and the baggage claim is where most people pick up the people or wait for people that they're waiting for. So there wasn't any problem with 9-11, and furthermore, 9-11 was not an issue. I think the point that opposing counsel was raising is he went as far as he could go. It used to be in a day long ago in a land far away that you could actually, if you were meeting somebody at the airport, you could actually walk up to the gate. It seems so long ago that most of us don't even remember those days, but it did used to happen. That's right. I even remember airports without metal detectors, but what I think the government is saying is after 9-11, you could no longer, if you're meeting somebody on a flight, you can no longer walk up to the gate. You have to have a boarding pass to get to the gate. That's true, Your Honor. So Mr. Schnepper went as far as he could possibly go to meet an arriving passenger, which is to be there at the baggage claim. That's not correct, Your Honor. He could have gone farther. I mean, he couldn't have gone to the actual gate itself, but he could have gone halfway there because the boarding pass area is somewhat toward the center of the terminal. He was waiting outside, which is the common practice for most people to do. And furthermore, Would that be the distinction you'd rest your case on? No, Your Honor. I'm just trying to point out that, well, it is a distinction,  and this has to be tied in with the idea that the reason that Mr. Schnepper was there was because of the inducements that were made by the government. In fact, the government agent was the one that came to the island, or at least on paper she did. She was the one that supposedly called from the hotel on Maui, much to Mr. Schnepper's surprise. And as pointed out in our brief, Mr. Schnepper had the opportunity, as Your Honor pointed out, that once he saw that this was, in fact, an agent, he could have just simply turned around and walked away because that's what his testimony was, that he expected that this person was going to be an adult that was playing a cyber game, and he would have found out immediately that that was, in fact, the case. So we would submit, Your Honor, that this whole issue of Buffington and Meek is intertwined, if the Court will, with the whole issue of the inducements by the government after the alleged attempt took place. Okay, Mr. Kawanis, thank you very much. Thank you, Your Honor. The case is now your stand submitted.
judges: Kozinski, McKeown, Hogan